## FINK v. V. FOSCATO, Inc., et al.
### No. 6709.

District Court, E. D. New York.

Aug. 9, 1934.

Frank J. Kent and Charles F. Chisholm, both of New York City, for plaintiff.

Redding, Greeley, O'Shea & Campbell, of New York City (Granville M. Brumbaugh and Timothy D. Parkman, both of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

This action is brought by the plaintiff for the alleged infringement of patent No. 1,914,115, issued to Harry L. Fink, the plaintiff, for terrazzo strip, granted June 13, 1933, on an application filed April 12, 1928, and of patent No. 1,791,267, issued to Harry L. Fink, the plaintiff, for terrazzo strips, granted February 3, 1931, on an application filed June 24, 1929.

Plaintiff is the owner of the aforesaid patents.

The defendants Toolan and Jaklitsch, doing business under the name and style of Pioneer Metal Goods Manufacturing Company, made a terrazzo strip at the instigation of the defendant V. Foscato, Inc., the user.

The strip in issue here is of the type known as a "heavy top" terrazzo strip.

The heavy top construction disclosed in both patents in suit is the same except for the means used to secure the top bar to the body section of the strip.

Patent No. 1,914,115 shows the top bar secured by welding.

Patent No. 1,791,267 shows the top bar secured by hollow or tubular rivets.

A "terrazzo floor" is a floor formed of a concrete mixture in which marble chips are

mixed, and "terrazzo strips" are strips which are imbedded in this mixture and serve, among other functions, to sectionalize the floor and prevent cracks formed in one section from extending into adjacent sections.

Terrazzo floors, laid with divider strips, are not new; they are shown in British patent to Mainzer, No. 3,947, of 1901, and Swiss patent to Cassini, No. 50,786, of 1910; but terrazzo divider strips of any type did not come into use in this country until 1921 or 1922.

In 1924 the plaintiff, after twenty years' experience as a machinist, tool maker, and tool designer, entered the terrazzo strip field as president and general manager of the Manhattan Terrazzo Brass Strip Company, Inc. He did not at once discover the solution of the problem presented by the demand for the heavy top terrazzo strip, but only after various efforts he solved one half of the problem by the side rabbeting of the top bar, and the other half of the problem by riveting the parts together with tubular rivets.

The advantages of the invention of the patents in suit are reduction in cost, ease, speed, and accuracy of manufacture and flexibility of manufacture, and, in addition, the advantages of the heavy top strip over plain strip, when it comes to setting it in the floor.

While under proper objection of defendants' counsel plaintiff was prevented from offering a summary of the sales of the patented strip only, the fact remains that it had success with the defendant V. Foscato, Inc., which had purchased such strips from plaintiff for several years, and that plaintiff had sold it to other customers all over the country.

The connection of the defendant V. Foscato, Inc., with the defendants Joseph P. Toolan and Joseph Jaklitsch, doing business under the name and style of Pioneer Metal Goods Manufacturing Company, in so far as the infringements alleged in the suit are concerned, is clearly shown by the fact that the defendant V. Foscato, Inc., purchases the brass from Chase Brass Company, and at the direction of said defendant V. Foscato, Inc., the brass is shipped by Chase Brass Company to the said defendants Toolan and Jaklitsch, Pioneer Metal Goods Manufacturing Company, from which brass owned by the defendant V. Foscato, Inc., the said Pioneer Metal Goods Manufacturing Company fabricate the strip used by defendant V. Foscato, Inc.

The first above patent in suit, No. 1,914,115, contains twelve claims, all for a terrazzo strip, and this suit is based on all of them with the exception of claim 3. Those claims may be analyzed as follows:

Claim 1 includes (a) a base strip of sheet metal of moderate thickness; (b) an operatively integral metal head of relatively thick cross section, having a top surface of substantial width, greater than that of the base strip; (c) a rabbet in the head running along one lower edge thereof, and into which the upper part of the base strip fits with an upper side portion against the side of the rabbet, and its top edge engaging the top of the rabbet.

Claim 2 is similar to claim 1, the terms thereof including the head members as being originally separate, and having substantial thickness as well as a wide top surface. This head member is further defined as being permanently secured to an upper portion of the base strip.

Claim 4 follows the terms of claim 1, and further defines the top bar as having a polygonal cross section, and having a portion overlying the upper edge of the base strip.

Claim 5 includes more broadly the elements (a) and (b) of claim 1, and then element (c) thereof, adding a further element as follows: (d) Means for permanently securing the abutting portions of said bar and base strip to each other.

Claim 6 includes broadly the originally separate upper and lower sections (elements (a) and (b), and then defines the rabbet formation (element (c) as follows:

One of said sections being formed to present substantially flat surfaces, positioned in two planes which form a re-entrant angle, into which the other angle may be assembled by sidewise motion, and the other section having an edge contacting with one of said surfaces, and a side contacting with the other of said surfaces.

Claim 6 then includes a last element, which consists of means permanently securing the two sections together.

Claim 7 follows the terminology of claim 6, save in defining the terrazzo strip as having an uninterrupted straight upper edge, and said claim additionally calls for anchoring means extending outwardly from one side of the lower section.

Claim 8 includes originally separate upper and lower metal sections, these elements corresponding to elements (a) and (b) of

claim 1, and further defines the formation of these elements as follows:

One of said sections being formed to present substantially flat surfaces positioned in two planes which form a re-entrant angle that is substantially a right angle, and the other of said sections having a side surface and an edge surface forming an exterior angle that is also substantially a right angle, the two sections being assembled with the exterior angle of one section nesting with the re-entrant angle of the other section, and said claim then sets forth element (d) of certain of the previous claims by calling for means for permanently securing the two sections together.

Claim 9 is similar to claim 8, except in defining the upper and lower sections in the following terms: The lower section being formed from sheet metal of moderate thickness, and the upper section being of metal of greater thickness.

Claim 10, in addition to the terminology of claim 9, defines the two planes formed on one of the sections as being vertical and horizontal planes, and additionally defines the securing means as means for securing together the contacting vertical surfaces of the two sections.

Claim 11 follows the terminology of claim 9, and additionally defines the terrazzo strip as having uninterrupted straight upper and lower edges, and also adds an additional element as follows: (e) An anchoring means extending outwardly from one side of the lower section.

Claim 12 is similar to claim 5, but calling in addition for the top bar, as having a straight uninterrupted upper edge. The claim then is concluded in language as follows: Said top bar having a rabbet running along one of its lower edges, whereby the lower portion of the top bar is of lesser thickness than the upper portion, means for securing the base strip to the thinner portion of the top bar, and anchoring means projecting outwardly from the base strip.

The second above patent in suit, No. 1,791,267, contains four claims, all for a terrazzo strip, and this suit is based on all of them. Those claims may be analyzed as follows:

Claim 1 contains the following elements: (a) A base strip of sheet metal of moderate thickness; (b) a top bar of relatively thick cross section, having a top surface of substantial width, and a depending portion lying against the upper margin of the strip; (c) the bar and the strip being secured together by hollow rivets passing through the strip and said depending portion of the bar.

Claim 2 is identical with claim 1, save that element (c) is modified to define the rivets as being tubular.

Claim 3 is identical with claim 2, save that the ends of the rivets are recited as being flanged over to engage the strip and bar faces.

Claim 4 is identical with claim 3, save that the base strip (element (a) above) is additionally defined as having straight uninterrupted longitudinal edges and pressed out portions between the edges for anchoring the base strip in cement or the like, and save that the top bar (element (b) above) is defined as having an L-shaped cross section.

The defendant offered in evidence the following alleged prior art patents and the Chase Catalogue.

Reissue patent No. 17,815, to Galassi, of September 23, 1930 (original No. 1,677,760), shows a strip with a heavy top, which is integral with the body section and would be expensive and unsuited for commercial manufacture and use.

Patent No. 584,574, to Caldwell, of June 15, 1897, shows a railroad rail having a wide supporting flange at the bottom. This rail is entirely unfitted for use as a guide strip.

Patent No. 893,198, to Schachner, of July 14, 1908, shows a stair tread, which does not even suggest the patented strip.

Patent No. 1,089,943, to Morse, March 10, 1914, shows a T-bar inserted into a roadbed between two compressible strips, 7, 7, composed of any suitable material, and designed to compensate for any expansion or contraction in the sections of the roadway. (Specification, p. 1, lines 72–74.) The witness Foscato was in error when he testified that the strips 7, 7 shown in the drawing were metal.

Patent No. 1,241,826, to Davis, of October 2, 1917, shows a strip 6 of expansive material, to separate asphalt (Specification, p. 1, lines 71–75), and strip 7 supported on spaced pins which are driven into the ground. This patent relates to pavements, and would not be of use in terrazzo work, as in that work there would not be sufficient screed available to initially support the strip. In attaching the spaced pins, the patentee was not confronted with the problems as to alignment, stretching of the metal, etc., involved in attaching a continuous body strip to a top bar, as in the patent in suit.

Patent No. 1,401,590, to Del Turco, of December 27, 1921, shows a terrazzo strip but

not a heavy top terrazzo strip. In Fig. 1 the entire strip is of metal. In Fig. 2 the bottom of the strip is made of wood.

Patent No. 1,451,491, to Calkins, of April 10, 1923, shows a strip made throughout of thin metal. Figs. 5 and 7 show a modified form in which the strip is so folded over that it is ground in two, in finishing the floor. It possesses none of the advantages or economies of the patents in suit.

Patent No. 1,460,841, to Briody, of July 3, 1923, shows a strip with a heavy top member for contraction joint for roadways, but does not show any side rabbeting. The heavy top member is merely a temporary member that is removed from the roadway, and strip to provide a space that is filled with asphalt or tar. (Specification, p. 1, lines 25–29 and 50–53.)

Patent No. 1,544,733, to Ferrarini, of July 7, 1925, shows a channel member, which is placed in the screed (see Fig. 2), and a member 16, which is then merely set into the channel and is removable.

Patent No. 1,571,700, to Burrell, of February 2, 1926, shows removable soft rubber top members, 33 and 34, which are taken out, leaving a space that is filled with asphalt. (Specification, p. 1, lines 30–35, p. 2, lines 18–33.)

Patent No. 1,667,313, to Galassi, of April 24, 1928, shows a channel which goes into the screed and carries a top member which is not rabbeted. It requires a special bottom section, as many different ones being required as there are widths of demarcation lines to be produced in the floor.

Patent No. 1,715,193, to Galassi, of May 28, 1929, the filing date of which was after the filing date of patent No. 1,914,115 in suit. The making of the strip as described (Specification, p. 2, lines 29–70) needs no further consideration, as the expense and difficulty thereof is apparent.

Patent No. 1,718,041, to Galassi, of June 18, 1929, shows the upper and lower sections of thin metal dovetailed together. This would be hard to accomplish and to hold, the dovetail would have to be tightly wedged, and the bending and distortion produced would be even worse than that produced by a solid rivet.

Patent No. 1,723,825, to Traitel, of August 6, 1929, shows a top bar grooved in the center, into which groove the body strip must be inserted edgewise. Dirt or burrs in the groove will be hidden and interfere with the assembly.

As there must be left sufficient metal on each side of the body section to swage and make the attachment after the groove is cut in the top bar, that construction is only adaptable for making of quite wide demarcation lines in the floor. As the body section must fit the groove, a different top bar is required for each thickness of body section to be used.

British patent No. 1637, of 1879, to Jorgen Daniel Larsen, shows a railroad rail, and is unfitted for use as a guide rail.

British patent No. 232,728, to Richard Marus, of April 30, 1925, shows a structure to which the limitations of the Traitel United States patent No. 1,723,825 also apply, and in addition the foundation must be carefully leveled, the strips laid on top of the foundation, and then the screed coat applied.

Page 50 of the Chase Catalogue is not available as a publication, but it was stipulated that shapes on that page, having numbers between 1 and 180, were manufactured and sold prior to April 12, 1926.

While it is true that some of the shapes are similar to the top bar of the patented strip, that is not of moment, as the claims in suit are not for the top bar, and the shapes themselves do not suggest the patented construction. With these shapes on the market, had the construction of the patents in suit been obvious, there would not have been such a long delay in reaching the result.

None of the said alleged prior art patents or catalogue disclose or suggest the constructions called for in any of the claims in suit.

The patents in suit were issued by the Patent Office over what I consider the best references, and as to patent No. 1,914,115, priority was awarded to plaintiff on an interference; three of the claims on which priority was awarded being claims 1, 2, and 5 of patent No. 1,914,115. Hildreth v. Mastoras, 257 U. S. 27, 32, 42 S. Ct. 20, 66 L. Ed. 112.

In any event, no reference cited by the defendants which was not cited in the Patent Office is any better than those considered by the Primary Examiner and Examiner of Interferences.

That the solution of the problem here in question by the patentee took several years of experimenting, and several false starts, before it was reached, does not show lack of invention. Ruud Mfg. Co. v. Long, etc., Co. (C. C. A.) 250 F. 860, 862.

That the solution of the problem was not obvious is shown, not only by the long experimentation of the patentee of the patents in suit, but also by the fact that Benjamin

772

Traitel, who was a practical man in the terrazzo business and was working on the problem, did not find it obvious but arrived at the construction of patent No. 1,723,825, and that Pasquale Galassi, who was also a practical man in both the terrazzo business and the terrazzo strip trade, and was working on the problem and arrived at the construction of patents 1,667,313 (filed May 19, 1927), 1,-677,760 (filed January 18, 1928), and 1,718,-041 (filed February 6, 1928), and finally the construction in issue as shown by interference 63,225, priority of invention however being awarded to Fink.

All of this to me is evidence of invention. United Chromium v. International Silver Co. (C. C. A.) 60 F.(2d) 913, 916, certiorari denied, 288 U. S. 600, 53 S. Ct. 319, 77 L. Ed. 976. Therefore I see no necessity of discussing the cases cited by defendant to show that it does not involve invention merely to consolidate into one piece what had formerly consisted of two or more pieces, as I have found that the invention in this case consisted of much more than such consolidation.

The patents in suit are valid.

We will now consider the question of infringement.

*As to Patent No. 1,914,115:*

The arrangement of top bar and body section of the defendants' strip is that disclosed in patent No. 1,914,115 in suit; the two parts being riveted together instead of being welded.

There is no limitation in any of the claims in suit to any particular means for securing the top bar to the body section, therefore they all apply to the defendants' strip, and defendants, by riveting the two parts together instead of welding them, do not escape infringement.

The claims of both the patents in suit are not so limited by the file wrapper history that they do not apply to defendants' structure.

There were five claims in the application filed for patent No. 1,914,115 in suit, and none of them were limited to the rabbet construction. After rejection, they were amended by specifying as follows: "Head having a rabbet running along one lower edge of the head and into which the upper part of the base strip fits, with an upper side portion against the side of the rabbet and into its top edge engaging the top of said rabbet."

■ Under the file wrapper estoppel, of course, plaintiff cannot ignore this inserted limitation and give the claim the same scope of the original claim, Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564, 570; John I. Paulding, Inc., v. Leviton (C. C. A.) 45 F.(2d) 125; Enison-Freeman Co. v. Levy (C. C. A.) 55 F.(2d) 1057; but I do not see how the rule helps the defendants since they have the claimed construction with the inserted limitation. Standard Brick Co. v. Denison Interlocking Tile Corporation (C. C. A.) 285 F. 108, 110.

No original claim was rejected and canceled, no other amendments to claims were made, and the amendment above recited was the only acquiescence in rejection, and the only thing in the file history which acts as a limitation. Additional new claims were added by an amendment filed January 13, 1933. The Examiner did not reject any of the claims, but asked that the number of claims be limited to twelve, and left their selection to the attorney, and to comply with this request five claims were canceled by amendment, dated April 24, 1933.

Defendants infringe the claims in suit of patent No. 1,914,115.

*As to Patent No. 1,791,267:*

The arrangement of the top bar and body section of the defendants' strip is that disclosed in patent No. 1,791,267 in suit. The patent in suit shows the parts secured by tubular rivets having perforated heads, while the defendants use tubular rivets having solid heads.

This does not relieve from infringement, as the claims do not limit as to the nature of the heads of the rivets. They call broadly for "hollow rivets" or "tubular rivets."

Defendants' rivets are both hollow and tubular, of a standard variety sold as tubular rivets.

There are advantages in the use of tubular rivets, and the rivets used by defendants give all the manufacturing advantages of the rivets shown in the patent in suit.

There is no reference to cross-bonding in the claims of the patent in suit, even as a function of the structure or through a "whereby" clause.

The patentee considered that the anchoring of the strip to the floor would be enhanced by cross-bonding through the rivets. Defendants provide for anchorage into the rivet, but only on one side of the strip, and therefore to a lesser degree.

■ Defendants cannot escape infringement because their device is not in some respects

as good as the patented device, or because defendants have impaired a function of the patented device. General Electric Co. v. Alexander (C. C. A.) 280 F. 852, 855.

Cross-bonding at the rivet was not considered essential by the plaintiff, defendants, or the patent itself, but is an auxiliary function described in the specification. (Page 1, lines 27–29, 90–93.)

■ There is no file wrapper estoppel which limits or restricts the claims to tubular rivets having perforated heads.

Such estoppel arises only through amendment and cancellation of claims to overcome rejection; that is not found in the case, but the claim of such estoppel rests in the attorneys' argument before the Patent Office, and this cannot be considered. A. G. Spalding & Bros. v. John Wanamaker (C. C. A.) 256 F. 530, 533; Baltzley v. Spengler Loomis Mfg. Co. (C. C. A.) 262 F. 423; Auto Pneumatic Action Co. v. Kindler & Collins (C. C. A.) 247 F. 323, 328.

The cancellation of the original claims 1 and 3 which called broadly for "rivets" without any limitation whatever as to the type of rivet, and were broad enough to include the solid rivet, which was unsatisfactory, prevents the claims in suit from being read to cover all types of rivets, and limits them to hollow rivets or tubular rivets. The words "hollow" and "tubular" are entitled to a reasonable range of equivalents, and those words are not to be so restricted as to exclude a standard type of tubular rivet, which has all the advantages as to manufacture and similar advantages as to bonding as those of the patent in suit. Deitel v. Unique Specialty Corporation (C. C. A.) 54 F.(2d) 359, 360.

The strip, which was the thing patented, was new and useful, and, even if the patentee was mistaken as to what takes place when the strip is put in the floor, that was immaterial. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 435, 31 S. Ct. 444, 55 L. Ed. 527.

Whether defendants' view that neither Fink nor the defendants get cross-bond, which is not only useless but a detriment, be or be not the proper one, the defendants have appropriated all that is of value in plaintiff's structure. Rockwood v. General Fire Extinguisher Co. (C. C. A.) 8 F.(2d) 682, 688.

Even a technical avoidance of the claimed structure will not suffice. Hoyt v. Horne, 145 U. S. 302, 308, 12 S. Ct. 922, 36 L. Ed. 713.

Defendants infringe the claims in suit of patent No. 1,791,267.

As to marking and notice, if there be any real question, it may properly be left to the accounting. Bassick Mfg. Co. v. Adams Grease Gun Corporation (C. C. A.) 52 F. (2d) 36, 41. Suffice to say that the accounting herein should be for the period subsequent to December 6, 1932, subject to any question there may be as to notice and marking.

The plaintiff is entitled to a decree against the defendant with injunction, accounting, and costs, and the usual order of reference.

A decree may be entered in accordance with this opinion. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by rule 70½ of the Equity Rules and rule 11 of the Equity Rules (28 USCA § 723) of this court.