**UNITED CHROMIUM, Inc., v. KOHLER CO. (two cases).**

**Nos. 8775, 8776.**

Circuit Court of Appeals, Seventh Circuit.

Feb. 8, 1947.

Rehearing Denied March 24, 1947.

John W. Michael and Gerrit D. Foster, both of Milwaukee, Wis., Newton A. Burgess and Gustave R. Thompson, both of New York City, and C. B. Spangenberg and Dawson, Booth & Spangenberg, all of Chicago, Ill., for plaintiff United Chromium, Inc.

Louis Quarles and David A. Fox, both of Milwaukee, Wis., Maxwell Barus and Charles H. Walker, both of New York City, Lyman C. Conger, of Kohler, Wis., and W. Philip Churchill, of New York City, for defendant Kohler Co.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff brought suit for infringement of patent to Fink No. 1,581,188, application filed December 19, 1925, patent issued April 20, 1926, and patent to Fink No. 1,802,463, issued April 28, 1931 upon an application filed September 19, 1925. The court entered judgment of validity of the first patent and infringement by defendant and invalidity of the second. Defendant appeals from the judgment upon the first patent and plaintiff from that upon the second.

The first patent was held valid by the District Court of Connecticut in United Chromium, Inc., v. International Silver Co., D.C., 53 F.2d 390. This judgment was affirmed by the United States Circuit Court of Appeals, Second Circuit, in 60 F.2d 913, 914. The patent was again held valid and infringed, in United Chromium, Inc., v. General Motors Corporation, by the same District Court, D.C., 11 F.Supp. 694. Upon appeal this judgment was reversed in 2 Cir., 85 F.2d 577, the patent being held invalid upon the Udy defense not offered in the International case. On reargument, the court adhered to its original decision. Certiorari was denied March 15, 1937, 300 U.S. 674, 57 S.Ct. 613, 81 L.Ed. 879. Still later the patent was held valid and infringed by the District Court in United Chromium v. Great Lakes, etc., Co.,[1] and in the present case, D.C., 55 F.Supp. 494.

In view of the full discussion of the art appearing in these reported opinions, especially the first decision by the Circuit Court of Appeals for the Second Circuit, we are relieved from burdening the record with the recital of many undisputed elementary facts. As appears from the last mentioned opinion, it is apparent that the art of electroplating is old; that certain common characteristics in the processes of plating various metals exist but that difficulty was experienced in perfecting chromium plating, although scientists were working with the problem from and after 1905. All electroplating involves immersion in a solution of proper ingredients, an anode and a cathode. An electric current passes through the solution to complete the circuit between the two poles, and as a result, the metal contained in the solution is deposited upon the cathode, the object to be plated. This was commonplace in all kinds of electroplating. The difficulty encountered in

---

[1] Oral, no opinion for publication.

chromium plating arose out of questions as to the proper composition of the solution through which the current is passed. All delvers in the art seem to have agreed that chromic acid is the most available form of the metal chromium for use in the solution. As the Court of Appeals pointed out in the International Silver case, this acid consists of a molecule of chromium and oxygen in the relation of one atom of the first to three of the second, the compound being symbolized as $CrO_3$. The electric current breaks the molecule, setting the chromium free near the cathode where it attaches itself to the cathode and forms the plating. But the solution involved another factor, variously described in the literature of the art and in the court decision as a "catalyst," "sulfate" or "radical." Sulfate is one specific radical out of many but is the one universally used both in the art and in commercial practice. The function of this radical, which does not enter into any part of the resulting plating, is that of a catalyst, a "bystander," so acting, when the current is passed through the solution, as to promote the deposit of chromium upon the cathode. One examining the various references in the art readily learns that all of the chemists working toward a successful chromium electroplating process experienced trouble in determining the proper proportionate amount of the radical or sulfate to use in order to achieve efficient results. Fink claims to be the first to have solved the problem completely and the court, in the International Silver case, after examining the prior art, concluded that he was the first inventor of the successful process. At that time the "Udy defense," which we shall hereafter discuss, was not a part of the prior art references, and not until the second appeal was that defense asserted in that court. In view of Udy's disclosure, in the second case the court concluded that Fink was not the first inventor but that Udy had taught earlier everything that Fink claimed.

Claim 10, asserted by plaintiff to be typical, reads as follows: "In a method of electrodepositing chromium from solutions of chromic acid, reducing the chromic acid at the cathode by a catalyst, the total of said catalyst being stable radicals not exceeding an amount equivalent to the proportion of five grams of sulfate radicals per litre of solution containing 250 grams of chromic acid." The claim recognizes the prior art. It asserts as a new element the requirement that the totality of all the radical contained in the solution must be taken into consideration and that the total content of that radical shall not exceed the specified proportion. In other words, Fink taught that there must be a ratio, fixed within certain elastic limits, between the total of the catalyst and the chromic acid in the solution.

In 1928 plaintiff filed a disclaimer as to claims 1, 2, 4, 5, 6, 10, 11, 12, 13 and 15, disclaiming any process in which regulating the radical component in proportion to the chromic acid is not practiced in "maintaining the efficiency thereof." This, said the Court of Appeals, in the International Silver case, had the practical effect of adding as an element a requirement that the radical "must be 'regulated * * * in maintaining efficiency of the bath'" [60 F.2d 914]; in other words, this disclaimer amounted to the addition to the claim of a provision that the proper proportion of the radical shall always be maintained. Consequently the elements of the claims, since the disclaimer, are that, in the process taught by the art, the compounder of the solution should take into consideration the total of all the radical, which should bear a specified ratio to the chromic acid, within rather noncritical limits, and that the ratio within such limits should be maintained throughout the process of plating.

As to the factor of maintenance of the ratio between chromic acid and the radical, the Court of Appeals, in the International case, thought that there was great "plausibility" in the contention that no invention was involved in requiring regulation or maintenance of any electroplating bath once it has been compounded. This, said the court, was the "common practice in the art generally," and, it would, "indeed seem a very plain thing, when success depends upon the proper proportions of the ingredients and the bath is used repeatedly, to take periodic samples of the solution and correct any variations which occurred. * * * The regulation of the bath was not the invention; it was a trivial part of the claims."

We agree that, indeed, it would seem elementary, where a scientist has devised a properly balanced solution, through which he passes an electric current in order to secure the deposit of the metal contained in a solution upon a cathode, that the content of that solution, tested and found efficient, should remain somewhat nearly constant in order not to upset or prevent the successful operation. If that be true, then the factors which went into Fink's claim of invention in his process over and above those taught by the prior art were that the totality of the content of the radical must be considered and that the ratio of total radical to total chromic acid be not more than one to fifty. For, if the requirement of maintenance is fundamentally elementary and obvious, as we believe, then the only remaining factors prescribed by Fink were the maximum ratio and the requirement that the compounder of the solution be careful to see that he had not overlooked any radical included in the solution. This being the situation, the Court of Appeals, in the International case, attributed to the ratio and to the necessity of consideration of the totality of the radical, the inventive feature of Fink's claims. It remarked that Fink taught that the catalyst was to be calculated from all sources contained in the solution, whether in the chromic acid, as an impurity, or in the substance added as a radical properly speaking or in any other matter in solution. That court said "what Fink really did was to single out the acid radical as the catalyst, disregarding the substance which happened to contain it [and] nobody had thought of this before." And so that court found "the invention good." It found that regulation of the bath in general the art knew; that the anodes were not defined, but that this was not necessary for that had been worked out in prior art, but that Fink was the first to discover the proper ratio between the radical and the chromic acid and to warn the compounder that, in determining this ratio, he should be careful to take into consideration the totality of all radical contained in the solution.

Following the International Silver decision, plaintiff brought suit against General Motors Company. Again the District Court found the patent valid and infringed but this time the Court of Appeals reversed in United Chromium, Inc. v. General Motors Corp., 2 Cir., 85 F.2d 577, 578. It was impelled so to do when it found that Fink was not the first inventor of the process claimed by him. It grounded its decision entirely upon a defense not presented in the first case but raised in the second, namely, the prior art as shown by the earlier patent application of Udy and his earlier practice of the art. The court recalled that in the first decision it had found that what Fink really did was to single out the acid radical without regard to what substance happened to retain it; and that only after repeated experiments had it occurred to Fink that the content of the radical was so important, but, said the court, the record then before it differed from that in the International case in that it clearly established prior invention by Udy, as the court termed it, "a complete and scientific disclosure." It pointed out that in his investigation and experimentation, as early as 1923, Udy had found that a solution containing chromic acid but no sulfate resulted in no deposit of chromium; that he added sulfate and, observing the varying results, conducted a series of runs to determine the exact effect of the absence or presence of different and varied amounts of radical; that, by this empirical method, he determined what part the acid radical played in the chromium plating; and that it was unnecessary to have the radical present in the form of chromic sulfate but that it was likely that a small amount of a free sulfate radical was necessary. By December 7, 1923, said the court, "Udy had a complete understanding of the invention." On February 4, 1924, he reported that the governing factors in electrolysis of such solution are the radical content and the content of chromium in the solution, saying "the limits to the above factors have already been made and discussed." And, said the court, in March, 1924, Udy made a full scientific disclosure of "how to make and maintain a bath of pure chromic acid by controlling the acid radical." In his application for patent, in June, 1924, Udy declared that, in accordance with his invention, "chromium is deposited from an aqueous solution of chromic acid con-

taining" a closely controlled quantity of sulphuric acid. Therefore, said the court, Udy, not Fink, was the first inventor. As we have remarked, a reargument was granted by the court, the decision adhered to and certiorari denied.

There is extended evidence in this record as to the prior art other than that of Udy but, in view of our conclusion, we do not think it necessary to examine and discuss that art which was largely but not entirely before the Court of Appeals for the Second Circuit in both of the cases cited. Nor is it necessary to determine for ourselves whether, upon the present record, the evidence as to the prior art is such that a scientist, skilled in his profession and having the benefit of instruction from what had been taught from 1905 to 1924, could, by doing what either Udy or Fink did, achieve invention. To enter into that determination would prolong our discussion unnecessarily and add nothing to the reasoning upon which we rely. We shall confine our inquiry to whether it can be fairly said that the earlier art of Udy taught Fink what the latter should do.

The terminology of these two qualified and experienced scientists is far from always being the same. At times one speaks of "regulating" and "maintaining" and the other of closely "controlling." One speaks of ratio and proportion; the other of stating the content of one substance as compared with the content of the other substance. One speaks of catalyst; both and still others speak of acid radical and sulfates. There is no magic in nomenclature in scientific investigation. The question is what did each scientist, using his own terms, mean? What did Fink mean? What did Udy mean? Such is our essential question in determining the ultimate effect of the respective expositions of the two delvers in the art. As we have said, there is no question but that Fink did specify and claim that consideration must be given to the total amount of radical sulfate or catalyst present in the solution and that he did fix, within certain elastic limits, his optimum of ratio between the metal compound and the sulfate compound. Then, too, by his disclaimer, he did specify regulation of the solution by maintenance of

its essential character. Was he the first to do this or any of this? The Court of Appeals for the Second Circuit thought he was not, but it is for us to determine the fact for ourselves.

Udy was employed by a subsidiary of the Union Carbide & Carbon Company. At the request of his employer, he went to work to develop processes for electrodepositing chromium metal in bulk, termed "chromium winning," and for plating manufactured articles, and reported monthly successfully plating many articles sent to him to be plated. By trial and error, over a year's period of time, he determined the proper proportion of sulfate to be included in a successful bath. He reported that his investigation resolved itself into the determination of the effect of $SO_4$ (the radical) in the solution and included definite conclusions as the result of his experiments as to the respective amounts of chromic acid and of sulfate in a successful solution and as to the ratio between them which gave the best results. He reported that "the solution must contain a small amount of an acid radical," and that the proper amount of the radical depends upon the concentration of the chromium. He reported that after including the desired quantity of pure chromic acid he added to the solution pure sulphuric acid containing the radical. The amount of $SO_4$, the radical, he said "can be figured with concentration of chromium." He added he preferred to use a solution containing between 10 to 15 grams chromium and .25 grams to .45 grams $SO_4$ per 100 cc. of solution. Translated into Fink's language, this results in 200 to 300 grams of chromium (chromic acid) per liter, and 2.5 to 4.5 grams of sulphuric acid per liter. In other words Udy's suggested proportions ran from 80 to 1 to 70 to 1, well within Fink's later suggestions, the latter's limits on the proper ratio between chromium content and sulfate content, running from 50 to 1 to 250 to 1, his optimum being 100 to 1. Udy's optimum is almost exactly the same as Fink's, for the solution found satisfactory by him in December, 1923, bore the approximate proportion of 100 to 1 of chromic acid and radical. With this solution Udy successfully plated articles both before and after

December, 1923 and his work was continued successfully long afterwards. It would seem apparent that Udy discovered and reported that efficiency in results might be obtained with chromic acid by adjusting the proportions of sulfate to chromic acid in approximately the same proportions as Fink later suggested.

Udy discovered, too, that other radicals might be used. He suggested sulfate as preferable but said that "no doubt other acids would serve the purpose." He warned that mineral acids are nonessential and are "to be avoided"; that the "chlorides are to be avoided"; that organic acids are "useless" and that "mineral acids like nitric and hydrochloric acids are to be avoided."

Plaintiff insists, however, that Udy did not teach that the total content of the radical must be taken into consideration. Again we must refer to Udy's language in his report on his processes as well as that in his application for a patent, earlier than Fink's. In the application he asserted that it was necessary to secure "a proper concentration of the sulphuric acid in the freshly prepared electrolyte and to prevent this concentration from increasing unduly." If these words mean anything they must mean that the compounder must have his eye on the exact amount of the total content of the radical and prevent undue increase in the proportionate amount of such radical. He recommended that the chromic acid should be purified to avoid any increase in the sulfate content, recited that the radical content is not destroyed in the electroplating process but continues in the bath indefinitely, as Fink puts it, as a catalyst, and said that by replenishing the consumed constituents, water and chromic acid, "the bath may be preserved for months with little or no change." The evidence discloses that in practice under the Fink patent, it is customary to analyze baths about "once every month or once every two months" in order to preserve proper proportions. When Udy, over a period of years, as a result of all his experiments, recommended a ratio between chromic acid and sulfate or radical well within Fink's limits, as we have shown, and said it must be controlled, and when he added that the presence of acids other than sulphuric

acid are to be avoided and that nitric acid and chloride or other impurities which may act as a radical should be avoided, it would seem that any one reading his disclosure would understand that he was informing the world that, in compounding the solution, care must be given to the amount of the radical and any excess avoided. This was the same doctrine which Fink later announced when he said that the compounder should take into consideration, in establishing the ratio, all the radical contained in the solution. The two scientists employed different terms, but they had the same idea. Clearly their respective experiments, by way of trial and error, led them to conclude in each instance that there must be a proper proportion within certain rather elastic limits and to agree in substance upon the proper ratio, one of them saying the totality of the radical must be carefully considered; the other that the radical should be controlled and that radicals other than the sulfate must be avoided. Obviously each of them was prescribing consideration of the total content of the radical in the solution.

There remains the element injected into the claim by the disclaimer, that of maintenance of the proportions. As we have pointed out, the Court of Appeals for the Second Circuit, in its first decision, thought that this "would indeed seem a very plain thing," for, when success depends upon the proper proportions of the ingredients and the bath is used repeatedly, to take periodic samples of the solution and correct any variations which occur would seem elementary indeed. As that court said, maintenance of the constituents of the bath is not the claimed invention. Even if this were an essential element, there is no doubt that Udy taught the same thing. He speaks of "control" of the nonessential factors in the solution and "control" of the essential factors, namely, the radical, the concentrate, the temperature. He reported that, if the chromium is allowed to increase in solution beyond the suggested limits, the voltage will increase; therefore, it must be "controlled." He reported that "if $SO_4$ content and the concentration are kept constant within the limits specified" the solution will take care of itself. Elsewhere in his

reports and application he disclosed clearly that it is essential to control the proportionate contents of the solution. "Control" of the content, "keeping constant the content" and "maintenance" of the content must mean the same thing. Indeed, the record is clear that Udy, before Fink, maintained the prescribed proportionate contents of the solution by chemical analysis and adjustments whenever deemed necessary. As Judge Hand indicated in the International Silver case, if the proper ratio is known and it is shown that consideration must be given to the amount of radical and certain amounts of sulfate and chromium are found to be in the proper proportion, it would seem obvious that, in order to obtain successful operation, there must be maintenance, preservation or control of the proportions, or in other words, that the sulfate must be calculated and maintained with reference to the chromic acid,—one as compared with the other,—in order to preserve the proper balance, that is the ratio.

So it seems to us, that whatever the effect and teachings of the art prior to Udy, the Court of Appeals for the Second Circuit in the General Motors case correctly found that Fink was not the first inventor, that his process was known to or used by others before his claimed invention; that, in view of Udy's prior invention, Udy's patent application should have been granted rather than Fink's and that Fink's patent must be held invalid.

The second Fink patent, found by the District Court to be invalid, claims an improved method for producing a bright chromium plating. In his original application he prescribed first that a finish be put on the article before the chromium is applied to it; then, he said, the chromium plating, which is thin, will reproduce the underlying surface. This preparation of the surface and plating and use of temperatures and current densities within a range delineated by graph X of the patent, constituted the basic elements of his claims. The Patent Office rejected the claims as unpatentable over the prior art and on November 17, 1930, five years after the application had been filed, Fink amended them to include the use of a bath prepared and maintained as described in the first patent granted four

years before that time. Fink finally received a patent for the claims in suit for 'a combination including the previously rejected and unpatentable prescribed steps and the bath prepared and maintained as prescribed in the first patent. The District Court found, properly we think, that when these claims were allowed, the public was free to use the bath composed and maintained as disclosed in the first Fink patent, or, as we find, as prescribed by the earlier Udy. The court added that there was no invention in preparing a bright or ornamental surface on an article to be plated so that the article after plating would reflect the finish of the underlying surface. This was old in the art. Temperatures and current densities suitable for bright plating were well known at the time when Fink filed his application. The only difficulty in successful commercial operation was in the composition and maintenance of the bath, which Fink taught in his first patent and which, we have seen, Udy taught prior to Fink.

The court thought that plaintiff's assertion of invention in the second patent amounted to an attempt to continue to monopolize the use of the process of the original patent for an additional five years by adopting the process of the first patent and held that the rights which Fink had in a bath composed and maintained as described in the original patent, if it were not anticipated, were exhausted when that patent expired. Saranac Automatic Mach. Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S. Ct. 232, 75 L.Ed. 634.

We think the trial court's conclusions were proper. That a thin coating of plated metal will reproduce the underlying surface was well known to the electroplating art. Controlling the finish of a plated article by applying a desired surface to the article prior to plating was taught as early as 1913, in a treatise on electrodeposition. Carveth and Curry in 1905 made similar suggestions about bright plating and Grube, in his prior patent, suggested deposit upon a polished metal to secure bright plating. Then there were the earlier Pfanhauser article in 1923 and that of Sargent in 1920. Udy, too, himself started out with the earlier Sargent formula; and, after experimentation, found and reported the condi-

tions suitable for successful bright plating long before anything claimed by Fink. He reported that the temperature of the bath has a decided effect upon both the current efficiency and the character of the plating and suggested the desirability of specific temperatures. He found the plating bright at the higher temperatures and gray at lower ones and said, certain temperature was the all important factor affecting the current efficiency and the color of the deposited metal. Haring, too, in an earlier article gave practically the same information concerning the requirements for bright plating as that contained in Fink's application for his second patent.

We agree with the District Court that the second patent was invalid for lack of invention; that it was anticipated; that there was prior invention; that there was lack of disclosure in the original application and that, if the first Fink patent is not anticipated, the attempt to assert validity of the patent was an unwarranted attempt to extend a monopoly.

In view of our conclusions we do not reach the question of infringement. The judgment of validity and infringement as to the first patent is reversed and cause remanded to the District Court to proceed in accord with this opinion with respect to that patent. The judgment of invalidity of the second patent is affirmed.