FOXBORO CO. v. TAYLOR INSTRUMENT COMPANIES.

Civil Action No. 1034.

District Court, W. D. New York.

Nov. 16, 1944.

John B. Bean and Edwin T. Bean, both of Buffalo, N. Y. (Blair, Curtis & Hayward, Edward G. Curtis, and Charles C. Ladd, all of New York City, of counsel), for plaintiff.

Frederick R. Twelvetrees, of Buffalo, N. Y. (Cooper, Kerr & Dunham, Drury W. Cooper, and Allan C. Bakewell, all of New York City, of counsel), for defendant.

BURKE, District Judge.

This suit is for the infringement of three patents; Mason reissue No. 20,092; Bristol reissue No. 19,944 and Bristol No. 1,624,887, all owned by the plaintiff. The Mason patent covers a mechanism for automatic control of industrial processes involving temperature, humidity, flow, pressure, liquid level, chemical concentration and the like. Prior to Mason's invention there was no controller capable of automatically controlling difficult multi-capacity manufacturing processes, i. e., the maintenance of some condition of the process at a desired point or within certain desired limits by regulating some variable affecting the condition of the process, usually by means of a feed valve. Between the years 1920 and 1930 the simple "batch" process of manufacture was gradually being replaced by complex continuous methods of manufacture. With the advent of multi-capacity processes such as fractionating towers in the oil refining industry, process control began to present troublesome problems. Available controllers which had proved adequate for comparatively simple manufacturing processes were inadequate. Automatic control of such processes had baffled engineers and inventors and makeshifts of various sorts in the form of control aids were resorted to which left much to be desired in the way of control. The controller industry had failed to solve the new problems of automatic control. Application for the original Mason patent No. 1,897,135 was filed on September 15, 1930.

Mason's invention was a new combination of elements and principles long known

to the controller industry. The principles of proportioning control and proportioning-plus-reset control had long been known but had not been successfully applied to control problems in many important industries. Unlike the simple on-off controller which causes the feed valve to either completely open or close, the action of a proportioning controller causes the feed valve to modulate its corrective action proportionally to the extent of the deviation of the process from the desired point of control. But this control is not enough on multi-capacity process where fresh demands are made on the process. The process will not return to its original control point, because to get increased flow it must be below it. Reset control supplies the deficiency. It keeps the feed valve operative as long as the process is deviated from the control point. Prior to Mason the only proportioning and proportioning-plus-reset controllers available on the market required powerful measuring elements to exert a force to operate the control mechanism. Such applications were limited in their use to the control of pressure and speed. The majority of such applications were in power plants and steel mills. None were available for controlling temperature, humidity or chemical reactions. Mason's controller was the first proportioning controller and the first proportioning-plus-reset controller that could be universally applied to all types of process. It could operate with low-power measuring elements because the measuring element was not required to exert and balance a force. Such low-power measuring elements were available for measuring all types of process conditions.

Mason's invention embraces a measuring element sensitive to the condition being controlled (temperature, pressure, etc.) with a free end movable to positions corresponding to the value of the condition being controlled, a nozzle-flapper pilot valve supplied with a restricted flow of air which detects and responds to changes of position of the measuring element, a relay valve responsive to the pressure back of the nozzle and controlling the air supply to and waste from the power-exerting mechanism of the controller, a pressure-fluid-operated diaphragm motor with a movable end mechanically connected to move the nozzle and pneumatically connected with the output of the relay valve to maintain the nozzle tangent to the flap-

per. The output pressure of the relay valve is the pressure in the diaphragm motor and is also the output power-exerting pressure of the controller to operate any convenient type of valve motor regulating flow effecting the condition being controlled. Thus in operation the movements of the measuring element are caused to be followed by a proportioning motor through the agency of a pilot valve that detects the position of the measuring element and operates a relay valve which so regulates the supply of air pressure to the motor that the motor moves to follow exactly the movements of the measuring element. The pressure operating the motor is proportional to the position of the measuring element. In addition to this proportioning controller thus far outlined Mason provided a mechanism for reset action operated in opposition to the proportioning motor, consisting of another diaphragm motor counteracting the proportioning motor. The controlled pressure in the system is transmitted to the interior of the reset motor through a length of capillary tubing providing a retarded flow of air to permit a gradual change in the pressure within the reset diaphragm. The operation of the reset mechanism provides for throttling the feed valve as it approaches the control point and constitutes a balancing mechanism establishing a control balance at a definite point of control. There is always a tendency to establish equal pressures in the proportioning and reset motors through the capillary tubing. The combination permits a definite control point regardless of varying demands of the process being controlled.

The defendant contends that the Mason patent is invalid for lack of sufficient disclosure in that the specifications and drawings do not meet statutory requirements. 35 U.S.C.A. § 33. It must be remembered (the defendant points it out in the brief) that all of the instrumentalities used by Mason were old and well-known. It was the new combination of well-known elements that Mason claimed. There was no need to disclose the details of instrumentalities well known. United Chromium, Inc. v. International Silver Co., 2 Cir., 60 F.2d 913. Diaphragms, bellows, relay valves and the use of levers were common in the controller art prior to Mason's invention and their characteristics were well-known. Mason's invention did not go to the details of any of these basic elements.

The defendant points out that the Mason patent drawings neither show the spring characteristic of Mason's diaphragms nor is it described in the specifications. But this characteristic and its part in the operation of the controller are made evident in the patent specifications for one skilled in the art and familiar with the use of diaphragms in common use as applied to prior commercial controllers and disclosed in many prior patents. The operation of Mason's controller as described would make it sufficiently clear that such operation could not take place without the inherent spring characteristic of the diaphragms either built in the diaphragms themselves or having the diaphragms opposed by external springs. For instance the Mason specifications discussing the operation of the controller as a proportioning controller point out that "pressure in diaphragms 39 and in the system is always directly proportional to the position of the flapper." If the diaphragms did not have a spring characteristic any pressure in the diaphragms would cause them to fully expand. To engineers skilled in the art, the drawings, specifications, and claims made it sufficiently evident that diaphragms with spring characteristics were intended although not specifically mentioned or described and that the controller could operate in no other manner. Inherent performances characteristic of known structures disclosed in a patent need not be described in the patent specification. Bickell v. Smith-Hamburg-Scott Welding Co., 2 Cir., 53 F.2d 356.

Foxboro's commercial controller, Model –10 Reactor, embodied all the elements of the proportioning controller and the same arrangement of the elements as disclosed in the Mason patent. The operation of this controller as demonstrated at the trial showed that it operated in the manner disclosed by the Mason patent. The measuring element used in this controller is a conventional spiral Bourdon tube similar to the helical measuring element shown in the Mason patent. Instead of using the restriction provided in the hollow valve stem of the relay valve as shown in the Mason patent, the commercial instrument provided an outside tube for the restricted air supply. This, however, was merely a mechanical adaptation for simplification of manufacturing and did not change the operation as disclosed in the patent. The proportioning bellows of the commercial instrument is the equivalent and performs the same function as the diaphragms shown in the patent. Other band-shifting mechanism is provided in the commercial instrument but this mechanism performs the same function and is the equivalent of that shown in the patent, the change in the commercial instrument being to accommodate the mechanism to a round instrument case. Likewise the manner of adjusting the width of the proportioning band in the commercial instrument is the equivalent of the arrangement shown in the Mason patent.

Foxboro's proportioning-plus-reset controller, the Stabilog, embraces all the elements of the Reactor and adds the reset bellows and capillary tubing. The operation of the Stabilog as demonstrated at the trial showed its operation to be as described in the Mason patent to obtain reset control in addition to its proportioning control. The buzzer nozzle used in Foxboro's commercial instruments did not change the control action of the instruments. They operate satisfactorily either with or without the buzzer nozzle. This was a refinement used to eliminate undesirable "pumping." But the "pumping" does not effect the control action because the oscillations are of such small magnitude and of such high frequency that they could not operate the control valve. The capacity tank and the "5 foot" capillary resistance, frequently added to temperature Stabilogs, superimposed on the proportioning-plus-reset controller another form of control called "derivative" control, but its addition did not change the proportioning and reset characteristics of the controllers. Measuring elements suitable to the processes being controlled are capable of being used interchangeably on all Foxboro instruments.

Mason's invention was an important advance in the application of controllers to commercial processes. It furnished full automatic and accurate control of processes which up to then had baffled instrument makers. It dispensed with all forms of control aids such as bi-passes, pin-hole gaskets and hand manipulation of feed valves. None of these had furnished satisfactory control because of their non-uniformity, inconsistency and unreliability. No controller up to then could be universally applied to all types of processes. It made possible the use of low-power measuring elements which were readily available for measuring all types of conditions.

It facilitated and in some cases made possible continuous process manufacturing. Certain processes in the oil refining industry were built around them. The quality of products was improved because of them. Loss of by-products in the chemical industry was prevented by their use. Although sales of control instruments in the industry generally were rapidly falling in the depression years, Foxboro's new controllers met with almost instant success, with little or no advance advertising aid in the beginning. The new instruments imposed automatic control upon difficult processes which up to then had not been subject to automatic control. They were adopted by leading manufacturers in this country and abroad attesting to their outstanding practical performance and success in solving the difficult problems of automatic control.

Three of defendant's controllers are charged to infringe the Mason patent. They are the so-called old Fulscope, Fulscope-Dubl-Response, and the so-called new Fulscope. The defendant started to market the old Fulscope and Dubl-Response controllers late in 1932 following plaintiff's instruments by about two years. Defendant's controllers differ in a number of details of construction from the corresponding details shown in Mason's patent drawings. In the old Fulscope defendant added to its old controllers which had used mechanical throttling action, a bellows operated by the output pressure of the relay valve which carried the nozzle on its free end so that the bellows moved the nozzle to follow the flapper to keep it tangent to the flapper as the flapper was moved by the measuring element. The motion of the baffle is relatively small because the proportioning bellows is small. This was a change in defendant's controllers from the old method of mechanical throttling to at least partial pneumatic throttling action which defendant called in its sales literature "pneumatic sensitivity reduction." It told the trade that its old Taylor equipment then in service could be equipped with pneumatic sensitivity reducing mechanism.

The old Fulscope was a proportioning controller. The Dubl-Response operating in conjunction with the old Fulscope added reset action to obtain a definite control point regardless of the varying demands of the process being controlled. The measuring element, the nozzle-baffle pilot valve, the relay valve and the proportioning bel-

lows of the old Fulscope were all equivalent to the corresponding parts of the Mason patent and performed the same functions in substantially the same manner. The mechanisms provided for shifting the proportioning band and for changing the width of the proportioning band in the old Fulscope were the mechanical equivalents of those shown in the Mason patent. Although the Dubl-Response is somewhat complex and different in structural details from Foxboro's Stabilog analysis reveals it in combination with the Fulscope to embrace all of the elements as shown in the Mason patent and the combination produces proportioning-plus-reset control in substantially the same manner as obtained by Mason.

The new Fulscope followed Mason's patent disclosure even in important construction details. The small proportioning bellows was replaced by a large bellows, by which fully pneumatic proportioning action was obtained. A reset motor replaced the reset leverage mechanism of the Dubl-Response. The bellows assembly of the new Fulscope is essentially like Mason's two bellows, although defendant's expert attempted to show that it was one, not two bellows like Mason's disclosure. But it, like Mason's pair of bellows, constituted a differential motor. Two pressures are contained in the bellows, connected through a needle valve which is equivalent to the capillary tubing of Mason's patent. The proportioning part of the bellows is connected to the output of the relay valve. Its movement is transmitted by means of a parallelogram assembly to the nozzle to keep it tangent to the flapper, as the flapper is moved by the measuring element. In the manner of operation the new Fulscope and plaintiff's instruments are practically identical. The new Fulscope added to proportioning and reset control another control effect called by defendant "Pre-Act", not covered by the Mason patent. This was a supplementary control effect similar to "derivative" action already referred to in plaintiff's instruments. The addition of "Pre-Act" control effect does not change the fundamental operation of the controller.

Defendant's controllers, despite their differences in shape and form of constructional details, have the same purpose, use the same instrumentalities arranged in the same functional sequence, operate on the same principle, and accomplish sub-

stantially the same result in substantially the same way as Mason's controller. This constitutes infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 42, 50 S.Ct. 9, 74 L.Ed. 147; Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. While Mason may not be said to have been a pioneer in the controller art, he led the way in that branch of it that deals with automatic control of difficult processes. His contribution was important and substantial. He was the first to successfully use universally adaptable pneumatic control. His claims are, therefore, entitled to broad construction. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523; Grubman Engineering & Mfg. Co. v. Goldberger, 2 Cir., 47 F.2d 151, 153; Gibbs v. Triumph Trap Co., Inc., 2 Cir., 26 F.2d 312, 314. The old Fulscope, the Fulscope Dubl-Response combination and the new Fulscope infringe claims of the Mason patent as set forth in detail in findings filed herewith.

■ Foxboro filed a voluntary disclaimer as to some of the Mason claims. Taylor contends that this was an admission that Mason was not the inventor of the subject matter of the disclaimed claims, that they were invalid and that Foxboro permitted other claims not patentably distinguishable to remain, thus rendering the entire patent void under the doctrine of Maytag Company v. Hurley Machine Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264. The doctrine of the Maytag case does not apply to a voluntary disclaimer. A voluntary disclaimer implies no admission as to the extent of the prior art. United Chromium Inc. v. International Silver Co., 2 Cir., 60 F.2d 913. But even if the doctrine of the Maytag case did apply, undisclaimed claim 4 of the Mason original patent is distinguishable from disclaimed claim 3. The final clause of undisclaimed claim 4 is more than a functional statement of adjustability. The adjustment referred to is accomplished by making the proportioning chamber "movable as a whole" to effect movement of one of the elements of the control couple. This clause also covers the relative movement of elements that accomplishes shifting of the proportioning band. Disclaimed claims 2, 3 and 5 provide in general terms for conjoint control of the nozzle and flapper by the measuring element and means responsive to the controlled pressure, whereas claim 1, undis-

claimed, provides that one element of the control couple, either the nozzle or flapper, is positioned by the measuring element and the other is positioned by means responsive to the control pressure. Claim 6, undisclaimed, provides for a pair of opposed pressure-operated motors, whereas claim 5, disclaimed, provides for a chamber subject to the control pressure. Claim 6 describes a controller with reset, whereas claim 5 describes a proportioning controller. There are also distinctions in structure between claim 16, undisclaimed, and disclaimed claims 7, 8, 9 and 10.

■ The original Mason patent was issued February 14, 1933. Notice of infringement was contained in a letter under date of March 27, 1933. This letter suggested a conference between representatives of Foxboro and Taylor. Taylor replied immediately agreeing to a conference and calling Foxboro's attention to four prior art patents. After examination of the cited patents and consultation with patent counsel Foxboro filed its disclaimer on May 11, 1933, relating to several of the claims. Foxboro did not notify Taylor that it had filed a disclaimer. Some delay ensued but a conference was finally held between representatives of Foxboro and Taylor in October 1934. At that conference Taylor proposed a combination of Taylor-owned and Foxboro-owned patent interests so that they might act jointly toward their competitors. Nothing came of this proposal. On February 11, 1935, Foxboro filed application for reissue of the patent. On May 17, 1935, Taylor again wrote Foxboro referring to the proposal for cooperative action. Foxboro replied by letter under date of June 3, 1935. Taylor places great stress upon this letter as indicating Foxboro's acquiescence in its opinion that the Mason patent was not infringed and that it had no intention of bringing suit upon it. That letter stated in part: "We believe, under the circumstances, it would be better for the Taylor Instrument Companies to pursue the course which they believe would be suitable to the Taylor Instrument Companies as if Foxboro were not involved." In my opinion the letter warranted no such construction. The letter was in reply to an inquiry regarding Foxboro's attitude on the proposal for cooperative action in patent interests. It was Foxboro's refusal of that proposal which had been made by Taylor as a means of settling the patent

differences commenced by the notice of infringement. The Mason patent was reissued September 1, 1936. Even after Foxboro had turned down the proposal for the pooling of patents, the matter was not considered dead. Conferences and discussions took place from time to time thereafter with inconclusive results. Not until October 18, 1940, in a letter from Taylor to Foxboro, did Taylor take a definite position as to what its attitude would be toward Foxboro's claim of infringement. Even after that letter a conference was held at which Taylor offered a nominal amount to avoid the prospect of litigation. This was in January 1941. This suit was filed in April 1942. Foxboro at no time after the original notice of infringement receded from its claim that Taylor was infringing. Prospects of settlement were never ruled out until January 1941. Whatever expenditures that Taylor meanwhile made for expansion of its business were made without any warranted assumption that Foxboro had receded from its original claim of infringement. They did not constitute a change of Taylor's position as one of the necessary elements of laches. The adjudicated cases where the defense of laches has been allowed or discussed go upon the theory of the infringer's conduct with regard to the invention proceeding upon some justified assurance growing out of the owner's acts or inaction to inspire confidence in the infringer's right to proceed. For example, Mosler & Co. v. Lurie, 2 Cir., 209 F. 364, 371, " * * * thus leading defendants and others to suppose that they intended to make no claim that their patent dominated a portion of that art, * * * "; and in Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823, 827, " * * * These cases say that there must be some assurance of impunity, the disappointment of which amounts to an estoppel * * * "; and in Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 3 Cir., 64 F.2d 185, 187, " *. * * that, because of the delay, the defendant has good reason to think that the plaintiff believes his asserted rights to be worthless or that he has abandoned them * * * "; and in Craftint Mfg. Co. v. Baker, 9 Cir., 94 F.2d 369, 374, "There must be reliance on the delay resulting in a change of position by the party asserting laches." In the case at bar Foxboro and Taylor were conducting negotiations looking to an amicable settlement of the differences from the original notice

of infringement down to January 1941. During the life of those negotiations defendant was at no time justified in believing that Foxboro had abandoned its rights. The filing of a disclaimer did not change Foxboro's position that Taylor was infringing the Mason patent nor did it change Taylor's position if it was actually infringing. If Foxboro's claim that Taylor was infringing was right, it continued to be right even after the disclaimer as to certain of the claims. If Taylor was infringing claims of the Mason patent not disclaimed, it continued to infringe the reissued patent for those claims were carried over and became part of the reissued patent.

The Trinks book published in 1919, cited as prior art by the defendant, does no more than explain, with the aid of diagrams, the principles of proportioning and proportioning-plus-reset control, which plaintiff concedes to be old. The diagrams do not show the instrumentalities used by Mason nor the manner in which Mason used them. Smoot controllers, made under Smoot patent 1,680,750 and Reissue 16,507, required, unlike Mason's, powerful measuring elements to exert a substantial force. They could not be used to control temperature because there were no temperature measuring elements available because of this limitation. These controllers were not adaptable to any process where only small forces could be exerted by measuring elements. None of the Smoot controllers uses the instrumentalities shown by Mason's patent.

Defendant's Type D, Type P, 3R and 27R controllers which antedated Mason are "bleed" type controllers. They have only mechanical proportionality and are but roughly proportional. Indeed defendant's expert referred to their action, not as proportional but as "corresponding." They were adaptable where process time lags were of small magnitude. Some were continued in use for such limited applications even after the Fulscope was produced. None of them used a nozzle-baffle pilot valve operated by a weak measuring element, none had a relay valve operated by a nozzle-baffle pilot valve and none had proportioning bellows. They are dissimilar to Mason's patent both in construction and operation. The Hygrostat and its accompanying relay were old Taylor control instruments. They were out of production long before Mason's patent. The

Hygrostat has a nozzle-baffle pilot valve and a relay valve operated by the output of the nozzle-baffle pilot valve. Its throttling action is mechanical. It has no proportioning bellows connected with the output of a relay valve to move the nozzle to follow the flapper. The Hygrostat Relay was used with the Hygrostat, when needed, to give greater force. It has no measuring element moveable to positions in accordance with the changes of the condition being controlled. It has no nozzle-baffle pilot valve and no relay valve operated by a pilot valve. Neither the Hygrostat, nor the Hygrostat Relay, nor the combination of the two resemble Mason's patent either in construction or manner of operation.

British Wingfield Patent No. 254,469 discloses three proportioning controllers. The object of these devices was to overcome "hunting." But the devices made under the patent were evidently inadequate to prevent "hunting" on difficult processes. As late as 1938 the Drayton Company, owner of the Wingfield patent, admitted the inadequacy to control top tower temperature in the plant of Hardman & Co. in England. The controllers made under this patent were not capable of automatically controlling difficult processes. The device disclosed in figure 1 of the patent has no nozzle-baffle pilot valve and has no relay valve operated by the output of a nozzle-baffle pilot valve. It does not have a low-powered measuring element and cannot be operated on a weak measuring element. It has no reset action. The device disclosed in figure 2 of the patent requires a powerful measuring element. It has no proportioning bellows. The output pressure of the control instrument is not proportionally responsive to the condition being controlled. The device disclosed in figure 3 of the patent shows a nozzle-baffle pilot valve, a relay valve and a proportioning bellows. But the relay valve is not operated by the output of the nozzle-baffle pilot valve. The proportioning bellows is not supplied with the output of the relay valve. Only one or two of these figure 3 controllers were made but they did not prove to have any particular advantage over the device disclosed in figure 1 of the patent.

British Lindsay patent 234,194 does not disclose a measuring element moveable to positions corresponding to the value of the condition being controlled. It does not have a proportioning bellows responsive to the condition being controlled. It has no reset action nor does it disclose output pressure changeable proportionally to the condition being controlled. DeFlorez patent 2,005,773 shows a device where the measuring element is directly connected to the control valve and moves it with force. It has no nozzle-baffle pilot valve and no relay valve. It does not have pneumatic proportioning action nor does it have reset control. The devices disclosed in Wünch patent 1,959,889 are force-balancing controllers like Smoot. They have no relay valve operating jointly with a pilot valve. All would require powerful measuring elements. Bristol patent 1,854,922 (not to be confused with plaintiff's Bristol patents in suit) discloses seven controllers none of them disclosing a controller with a low power measuring element moveable to positions in accordance with the condition being controlled and none of them discloses a relay valve operating in conjunction with a pilot valve, nor do they disclose output pressure responsive to changes in the condition being controlled. None of the commercial controllers nor any of the devices disclosed in the patents, which have been cited as prior art, use the same instrumentalities as Mason and none of them operate in the same manner as Mason's invention and none anticipates Mason's invention.

◼ The defendant contends that there was unreasonable delay in filing the reissue application and that this delay, with knowledge of defendant's instruments amounts to laches. The defendant was promptly notified of plaintiff's claim that its controllers infringed the original patent. Defendant's controllers were within the scope of claims of the original patent. The same claims of the original patent which defendant's instruments infringed were carried over as claims of the reissue patent. The re-issue application was filed within two years and was timely. Moreover, within the two year period plaintiff had changed its patent attorneys. The subject matter of the patent is extremely intricate and difficult to comprehend. The delay in filing the reissue application under the advice of attorneys, who were obliged to become familiar with the intricate principles of automatic control and such complicated mechanisms, is quite understandable under the circumstances. Whatever delay there was either in filing

the reissue application or in its prosecution in the Patent Office, no intervening rights are involved.

■ The reissue statute, 35 U.S.C.A. § 64, makes provision for the reissue of a patent when its defects or insufficiencies arose through inadvertence, accident, or mistake. The defendant contends that the reissued patent is invalid because there are no circumstances showing inadvertence, accident or mistake and that consequently the Commissioner exceeded his authority in granting the reissued patent. When there is any evidence of inadvertence, accident or mistake, the courts will not review the determination of the Commissioner, who must be presumed to have found the facts in favor of the applicant by granting the reissue. Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658; General Radio Co. v. Allen B. DuMont Laboratories, Inc., 3 Cir., 129 F.2d 608, 612; Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 960. In the reissue oath there is recited the fact that the specified errors arose because the inventor and his attorneys inadvertently failed to claim patentable features of the inventions which had been overlooked despite diligent study of the inventions and the prior art. It refers to the complexity of the subject matter and further avers that thorough analysis of the inventions and further legal study and advice have been made evident the inexactness and insufficiencies specified. In the General Radio case, supra, the Court, in holding the reissue patent invalid, concluded that the reissue oath was simply an averment of inadvertence, accident or mistake, in the language of the statute, without any supporting circumstances and that the patent itself belied the assertion. The Court noted in its opinion that there was no suggestion of anything in the prior art having been overlooked and concluded that the inventor's solicitors had drawn functional claims with the intention of covering any and all means which might later be devised to solve the problem and that the patentee was bound by the action of his solicitors, which constituted an error of judgment. In the present case the record does show that certain prior art had been overlooked and that some of the claims had been unnecessarily limited. The Mason patent was not reissued to correct functional claims. In Grand Rapids Show Case Co. v. Baker, 6 Cir., 216 F. 341, the Court in holding a reissued patent invalid held that the inventor in proceedings in the Patent Office under his original application deliberately abandoned broad claims and cancelled broad descriptive matter and inserted narrower claims to meet the Examiner's objection of broad claims and that he was not, after the issue of the patent, entitled to obtain a reissue broadening and enlarging his claims. In the present case there is no evidence of deliberate cancellation of broad claims during the prosecution of the original patent. All of the claims added by the reissue and all of the original but amended claims in the reissue are different in scope from the original claims affected by the disclaimer. In Heidbrink v. Charles H. Hardessen Co., 7 Cir., 25 F.2d 8, the Court in holding a reissued patent invalid noted that the claims of the reissued patent were broader than the claims of the original patent and that they were broadened for the sole purpose of including the appellee's machine and found that there was no error upon the part of the applicant traceable to inadvertence, accident or mistake. There the facts in the case were not at all similar to the case at bar.

■ The defendant contends that reissue claims 1, and 4 to 17 inclusive, are invalid because they were materially altered after the application for reissue was filed, and no supplemental oath was made to them by Mason and that reissue claims 18 to 25 inclusive are invalid on the ground that they were asserted long after the reissue application was filed and that Mason never made oath to the subject matter of any of them. The claims as allowed are supported by the disclosure as filed. No new oath was required either for those claims that were amended or for those claims that were inserted after the reissue application was filed. "* * * a claim fairly derivable from a sworn disclosure is good, whether originally presented or introduced by amendment; and such claim needs no supplemental oath." Westinghouse Electric & Mfg. Co. v. Metropolitan Elec. Mfg. Co., 2 Cir., 290 F. 661, 665. See also Heller Bros. Co. v. Crucible Steel Co., 3 Cir., 297 F. 39; Hartford Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539. The facts in Steward v. American Lava Co., 215 U.S. 161, 30 S.Ct. 46,

54 L.Ed. 139, cited by defendant, distinguish that case from the case at bar. There the Court held the patent could not be sustained because the theory and method of the invention were introduced for the first time in unverified amended specifications. In the Mason reissue patent there was no unverified alteration of the disclosure and no unverified theory was inserted by amendment. No changes were made in the drawings or in the description. The Patent Office required amending and re-writing the Mason reissue claims to make them more definite and to distinguish clearly from the prior art. The result of the amendments was a narrowing of the scope of the claims. Each of the reissue claims, both those that were amended during the reissue prosecution and the added claims, describe a controller, either proportioning or proportioning-plus-reset, using the same instrumentalities, their combination, arrangement, and operation as disclosed in the original application. The amended claims are more specific than the original claims as filed. The added claims are in part more specific than the original claims as filed and in part express certain of the instrumentalities in greater breadth than the original claims. They relate, however, to the same instrumentalities as described in the original claims. In none of the claims under discussion were instrumentalities added which had been omitted in the original claims nor were any instrumentalities omitted which in the original claims had been stated to be essential.

■ In support of its position that the claims of the Mason patent are bad for indefiniteness defendant cites General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, and United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232. In both of those cases the claims in suit were held to be bad because the patentee described the product in terms of function. Mason's claims have no such defect. The structures are adequately described to inform those skilled in the art and to distinguish over the prior art.

■ Commercial success of plaintiff's controllers is adequately established by the evidence. The defendant, however, argues that commercial success was not due to Mason's invention but to other features of the controllers such as bellows, flexible pen arms, frictionless type of bearings, delicate hair springs, buzzer-nozzles, capacity tanks and the like, none of which was the invention of Mason. But all of these were old and available to the art before Mason. They were refinements used in plaintiff's instruments but their use does not detract from the fundamental improvements over the prior art taught by Mason.

■ Bristol reissue patent No. 19,944, the second patent in suit, discloses a valve positioner to make a control valve move to positions exactly corresponding to pressures received from a controller in spite of adverse resistances such as friction between the valve stem and packing. Its purpose is to secure precision valve action so that the control valve will follow the instruction of the controller. The original Bristol patent No. 1,917,092 was dated July 4, 1933. Application for reissue was filed June 29, 1935, and the reissue patent was dated April 28, 1936. Defendant's Dubl-Response controller is charged to infringe this patent. The Dubl-Response controller was first marketed in 1932. Plaintiff knew of this controller even before the original Bristol patent issued. It never charged the defendant with infringement of the original patent. It was not until January 17, 1940, after defendant had stopped manufacturing its Dubl-Response controller, that notice of infringement of the reissue patent was given. This delay coupled with defendant's extensive sales of Dubl-Response controllers and plaintiff's knowledge of such use amounts to laches and is a bar to the suit for infringement based on this patent.

■ Application for Bristol patent No. 1,624,887 was filed August 10, 1920, and the patent issued April 12, 1927. It discloses a pneumatically operated recording controller which not only controls a condition but records its value. The improvement of the patent relates to an overthrow mechanism to permit the pen arm to continue to move after the baffle has contacted the nozzle. Defendant's Fulscope controllers are charged to infringe this patent. They were first marketed in 1932 but it was not until January 17, 1940, that defendant was notified that its instruments were charged to infringe this patent. The suit for infringement of this patent was added by amendment to the original complaint. There is no doubt that plaintiff knew of the defendant's Fulscopes from

the very beginning of their manufacture. Although numerous conferences were held between representatives of plaintiff and defendant and extensive correspondence was carried on, all dealing with defendant's alleged infringement of the Mason patent, no suggestion was ever made that any patent other than Mason was being infringed. The plaintiff argues that the defense of laches is reserved to those acting innocently and thus impliedly that the defendant's use of the Bristol disclosure in its instruments was with knowledge that it was infringing the Bristol patent. To impute such knowledge to the defendant would be to impute knowledge of infringement which apparently even the plaintiff itself did not have, although it was familiar with the controllers charged to infringe. In the notice of January 17, 1940, defendant was informed that further study of defendant's Fulscope and Dubl-Response controllers revealed their infringement not only of the Mason patent but also of Bristol reissue No. 19,944 and Bristol No. 1,624,887, the patent now under discussion. This would suggest recently acquired knowledge gained from further study of defendant's instruments. It seems hardly equitable to impute guilty knowledge to the defendant when the circumstances indicate that even the plaintiff possessed no such knowledge of infringement in spite of its familiarity with defendant's controllers. Even though the defense of laches is not available to the defendant as to the use of Mason's disclosure, how can it be said that the defendant would have continued to embody in its instruments plaintiff's precision valve mechanism and overthrow mechanism, if the plaintiff had unequivocally charged that these features infringed patents owned by the plaintiff. It might have modified its controllers to avoid infringement of these patents. A. R. Mosler & Co. v. Lurie, 2 Cir., 209 F. 364. Here also the long delay coupled with plaintiff's knowledge of defendant's controllers alleged to infringe and defendant's extensive sales over a long period of time amounts to laches so as to bar suit for infringement based on the Bristol patent No. 1,624,887.

Judgment for plaintiff on its suit for infringement based on Mason reissue No. 20,092. Judgment for defendant dismissing the complaint in so far as it is based on Bristol reissue No. 19,944 and Bristol No. 1,624,887. Findings of Fact and Conclusions of Law are filed herewith.